UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| S.S., a minor, by his mother, S.Y., on behalf of himself and other similarly situated students, and the Parent/Professional Advocacy League,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SPRINGFIELD, MASSACHUSETTS; DOMENIC SARNO, in his official capacity as Mayor of City of Springfield; SPRINGFIELD PUBLIC SCHOOLS; DANIEL J. WARWICK, in his official capacity as Superintendent of Springfield Public Schools,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  CIVIL ACTION NO. 14-30116<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## CLASS ACTION COMPLAINT

### I.     INTRODUCTION

1.     The City of Springfield ("City"), Springfield Public Schools ("SPS"), Mayor Sarno, and Superintendent Warwick (collectively "Defendants") operate a discriminatory public school system that consigns hundreds of children with a mental health disability to the separate and inferior Public Day School.  The Public Day School is not a therapeutic learning environment.  Children in the Public Day School do not have the same opportunity to learn and to graduate that is afforded their peers without a disability in Springfield's other schools ("neighborhood schools").  Academic expectations are low.  Education is not the primary mission of the Public Day School, and students make little academic progress there.

2.     Instead of fostering learning, the focus of the Public Day School is on behavior control using drastic methods including dangerous physical restraints, inappropriate forced isolation in padded rooms, and repeated arrests and suspensions for minor offenses.  Far from

being therapeutic, placement in the Public Day School is more likely to exacerbate a child's mental health condition than improve it.

3.      The Public Day School is also physically segregated from SPS's neighborhood schools.  It is located on three campuses and students consigned to the Public Day School are afforded zero opportunity to interact with students in SPS's neighborhood schools.

4.      Tragically, the children placed in the Public Day School do not need to be there. These are children of great promise.  They could be educated in neighborhood schools and given the same opportunity to progress academically and graduate that is enjoyed by their peers without a disability.  These children can be educated successfully in SPS's neighborhood schools with reasonable modification of SPS's programs and services and with the aid of appropriate school-based behavioral services.

5.      Defendants' failure to reasonably modify SPS's programs and services, and instead placing these children with a mental health disability in a wholly segregated educational setting, violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 *et seq.*

6.      The ADA mandates that Defendants (i) provide children with a mental health disability educational opportunities that are equal to and as effective as those provided other students; and (ii) serve students with a mental health disability in the most integrated setting appropriate to their needs, that is, the setting in which they have the greatest opportunity to be engaged with their peers without a disability.  By warehousing students with a mental health disability in the Public Day School, Defendants are violating both of the ADA's legal mandates.

7.      The ADA imposes on Defendants the obligation to reasonably modify SPS's programs and services to avoid discrimination.  Providing children with a mental health disability access to school-based behavior services -- to afford them equal educational

opportunity and to enable them to be educated in neighborhood schools -- is a reasonable modification required by the ADA.

8.    The Massachusetts Department of Elementary and Secondary Education ("DESE") has cited SPS for many of the deficiencies alleged here.   In an April 2014 "Coordinated Program Review Report of Findings" ("Program Review Report"), the DESE found SPS in violation of federal and state law as a result of, among other things:  removing students with disabilities from regular classrooms without appropriate justification; failing to provide needed behavior services to children with a mental health disability; and denying children in the Public Day School the opportunity to participate in extra-curricular and vocational programs.

9.    Plaintiff S.S., a fifteen year-old with a mental health disability who is currently segregated in the Public Day School, brings this suit on behalf of himself and other similarly situated students.   Plaintiff Parent/Professional Advocacy League ("PPAL") is a statewide, grassroots family organization that advocates for improved access to services for children with a mental health disability and their families.   Plaintiffs seek injunctive and declaratory relief for ongoing violations of the ADA, including an order that Defendants provide Plaintiff S.S. and the Plaintiff class with school-based behavior services in neighborhood schools to afford them an equal educational opportunity and enable them to be educated in neighborhood schools with their peers without a disability.

## II.    JURISDICTION AND VENUE

10.    This court has jurisdiction over this action under Title II of the ADA, 42 U.S.C. §§ 12131-12133, and 28 U.S.C. §§ 1331.  Declaratory relief is available pursuant to 28 U.S.C. §

2201 and Rule 57 of the Federal Rules of Civil Procedure.  Injunctive relief is authorized by 28 U.S.C. § 2202, and Rule 65 of the Federal Rules of Civil Procedure.

11.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391(b)(2), since all of the acts and omissions giving rise to these claims occurred in the Commonwealth of Massachusetts.  Venue is proper in the Western Division since the individual Plaintiff and all of the Defendants reside or are located in that Division.  Local R. 40.1(D)(1)(a).

## III.     EXHAUSTION OF ADMINISTRATIVE REMEDIES

12.     Plaintiff S.S. filed a Request for Hearing with the Massachusetts Bureau of Special Education Appeals ("BSEA") on behalf of himself and a class of similarly situated students on June 18, 2013, and an Amended Request on July 22, 2013, seeking injunctive and declaratory relief.  In particular, S.S. contended that SPS did not reasonably modify its programs and services to ensure that he and members of the class are afforded equal educational opportunity, including the opportunity to receive an education that is equal to and as effective as that provided other students and to receive educational programs and services in the most integrated setting appropriate to their needs.

13.     S.S. contended that SPS segregates him and similarly situated students in the separate and inferior Public Day School in violation of the ADA.

14.     On October 15, 2013, upon the motion of SPS, a BSEA Hearing Officer dismissed the class claims on the ground that the BSEA had no jurisdiction to decide them.

15.     An administrative hearing before the BSEA was held in this matter on January 22-24, 2014 to address S.S.'s individual claims.

16.     On March 27, 2014, the BSEA Hearing Officer issued a ruling dismissing all of S.S.'s ADA claims.  The Hearing Officer further ruled that S.S.'s placement and Individualized

Education Plan were reasonably calculated to provide him a free appropriate public education under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. § 1400, *et seq.*, M.G.L. c. 30A and c. 71B, and Section 504 of the Rehabilitation Act of 1973 ("Section 504"), codified at 29 U.S.C.§ 794.

17.     Having exhausted administrative remedies on behalf of himself and a class of similarly situated students, S.S. now files this Class Action Complaint seeking relief under the ADA.  S.S. does not appeal the BSEA Hearing Officer's decision regarding his claims under the IDEA, M.G.L. c. 30A and c. 71B, or Section 504.

## IV.   PARTIES

### A.     *Plaintiffs*

18.     Plaintiff S.S. is an African American 15 year-old student with a mental health disability enrolled in SPS.  He resides with his mother and younger siblings in Springfield, Massachusetts.  His mother, S.Y., brings this action on his behalf.

19.     Plaintiff PPAL is a statewide, grassroots family organization that advocates for improved access to services for children with a mental health disability and their families. Founded in 1991, PPAL is the Massachusetts state affiliate of the Federation of Families for Children's Mental Health, a national family-run organization that provides leadership at the national level.  There are more than 7,000 Massachusetts families who are constituents in PPAL's network, including Plaintiff S.S. and his mother.  In the twelve months prior to the filing of this Complaint, more than 150 Springfield families have sought help from or joined PPAL's network.  Many of PPAL's constituents from Springfield (*i.e.*, families who have sought help from or joined PPAL's network) have children with a mental health disability enrolled in SPS, including children who have been placed in the Public Day School or are at risk of being

transferred by SPS into the Public Day School.  PPAL's constituents, including families in Springfield, have a direct and active role in developing PPAL's advocacy activities.

20.     At least fifty-one percent of the members of PPAL's Board of Directors are parents of children with a mental health disability.

21.     PPAL's primary place of business is 45 Bromfield St., Boston, Massachusetts 02108, and it has an additional office in Worcester, Massachusetts.

### B.     Defendants

22.     Defendant City of Springfield operates and funds SPS, including all public school programs, services, and activities.  The City is a public entity as defined by Title II of the ADA. 42 U.S.C. § 12131.  The City's offices are located at 36 Court Street, Springfield, MA 01103.

23.     Defendant Domenic Sarno is sued in his official capacity as the Mayor of the City of Springfield.  As Mayor, Defendant Sarno supervises and is ultimately responsible for the operations of the executive departments of the City, including SPS and its compliance with federal law.  He annually submits a budget to the City Council for funding SPS.  By City Charter, Mayor Sarno is the Chairman of the Springfield School Committee.  Defendant Sarno's business offices are located at 36 Court Street, Springfield, MA 01103.

24.     Defendant Springfield Public Schools is a public entity as defined by Title II of the ADA. 42 U.S.C. § 12131.  SPS's business offices are located at 1550 Main Street, Springfield, MA 01103.

25.     Defendant Daniel J. Warwick is sued in his official capacity as the Superintendent of the Springfield Public Schools.  Pursuant to M.G.L. c. 71, § 37, he is appointed by the School Committee.  Defendant Warwick is responsible for the daily operations of SPS, including its

programs and services for students with a disability.  Defendant Warwick's business offices are located at 1550 Main Street, Springfield, MA 01103.

## V.    CLASS ACTION ALLEGATIONS

26.    Pursuant to Rules 23(a) and (b)(2) of the Federal Rules of Civil Procedure, Plaintiff S.S. brings this suit as a class action on his own behalf and on behalf of the following class:  All students placed now or in the future in SPS's Public Day School.

27.    The class is so numerous that joinder of all members is impracticable.  During the 2013-2014 school year, approximately 233 students with a mental health disability were enrolled in the Public Day School.  Joinder is also impracticable because SPS routinely enrolls new class members in the Public Day School and most class members lack the means to maintain individual actions.

28.    There are questions of law and fact common to the class, including whether Defendants are violating the ADA by, among other actions, employing policies and practices that:

> i.    Deny S.S. and members of the class an opportunity to participate in and benefit from educational services that is equal to that afforded students without a mental health disability;
>
> ii.    Deny S.S. and members of the class educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided students without a mental health disability;
>
> iii.    Fail to provide S.S. and members of the class educational programs and services in the most integrated setting appropriate to their needs by

unnecessarily segregating Plaintiff and class members in the Public Day School;

iv.      Fail to reasonably modify SPS's programs and services as needed to avoid discrimination; and

v.       Utilize methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs to educate and meet the behavioral service needs of students with a mental health disability, including S.S. and the class.

29.      The named Plaintiff S.S.'s claims are typical of the claims of the class.

30.      The Plaintiff class includes members who are PPAL constituents.

31.      Plaintiff S.S. will fairly and adequately protect the interests of the class.  Plaintiff S.S. will vigorously represent the interests of the unnamed class members, and all members of the proposed class will benefit from Plaintiff S.S.'s efforts.  There is no conflict between the interests of Plaintiff S.S. and the proposed class.

32.      Defendants have acted or will continue to act on grounds generally applicable to the Plaintiff class, thereby making appropriate injunctive and declaratory relief with respect to the class as a whole.

## VI.     THE AMERICANS WITH DISABILITIES ACT

33.      Congress enacted the ADA, 42 U.S.C. § 12101 *et seq*., to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities and to provide strong and consistent standards for identifying such discrimination.  42 U.S.C. § 12101(b)(1)&(2).

34.     The ADA is based on Congress's findings that, *inter alia*,   (i) "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem," 42 U.S.C. § 12101(a)(2), and   (ii) "individuals with disabilities continually encounter various forms of discrimination, including … relegation to lesser services, programs, activities, benefits, jobs, or other opportunities."   42 U.S.C. § 12101(a)(5).

35.     In enacting the ADA, Congress also found that "discrimination against individuals with disabilities persists in such critical areas as … education."   42 U.S.C. § 12101(a)(3).

36.     Title II of the ADA mandates that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132; *see also* 28 C.F.R. § 35.130.

37.     Title II of the ADA applies to all of the activities of public entities, including providing education.  Each Defendant is either a public entity subject to Title II of the ADA or an official responsible for supervising the operations of a public entity subject to Title II of the ADA.  42 U.S.C. § 12131(1).

38.     The discrimination prohibited under Title II of the ADA includes the needless isolation or segregation of persons with disabilities.  *Olmstead v. L.C.*, 527 U.S. 581, 600 (1999) ("unjustified institutional isolation of persons with disabilities is a form of discrimination"); *see also* 2011 *Statement of the US Department of Justice on Enforcement of the Integration Mandate of Title II of the ADA and Olmstead*, June 22, 2011.

39.     The ADA directs the Attorney General to promulgate regulations enforcing Title II of the ADA and provides guidance on their content.  The regulations promulgated by the Attorney General require public entities to "make reasonable modifications" to their programs and services "when the modifications are necessary to avoid discrimination." 28 C.F.R. § 35.130(b)(7).  The regulations also require public entities to "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities,"  28 C.F.R. § 35.130(d), which the Attorney General has defined as "a setting that enables individuals with disabilities to interact with non-disabled persons to the fullest extent possible."  28 C.F.R. pt. 35, App. A, p. 450.

40.     The regulations also specify that it is unlawful discrimination for a public entity to:

    i.    "Afford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," 28 C.F.R. § 35.130(b)(1)(ii);

    ii.    "Provide a qualified individual with a disability with an aid, benefit, or service  that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others," 28 C.F.R. § 35.130(b)(1)(iii); or

    iii.    "[U]tilize criteria or methods of administration … [t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities," 28 C.F.R. § 35.130(b)(3)(ii).

## VII.   STATEMENT OF FACTS

### A.   *The Springfield Public Schools*

41.     Defendant SPS is the second largest school district in Massachusetts, providing educational programs and services to approximately 25,826 children.  Its annual budget for the fiscal year 2014 is $357,868,724.  Approximately 62.2% of the children served are Hispanic and 20.2% are African American.

42.     SPS has identified approximately 5,032 (19.3%) of its students as having a disability and approximately 640 students (2.4% of all students) as having "emotional disturbance," a classification used by SPS to refer to students with a mental health disability that interferes with their education.  Of the approximately 640 so identified, 233 students (roughly one-third of all students classified as having an "emotional disturbance") have been assigned to the Public Day School.  The Public Day School has separate campuses for elementary, middle, and high school students.

43.     SPS operates approximately 50 other schools in addition to the Public Day School, of which 42 are neighborhood elementary, middle, or high schools.

44.     In its April 2014 Program Review Report, DESE found that:

  i.     SPS "does not consistently consider positive behavioral supports or the need for a functional behavioral assessment for students whose behavior repeatedly impedes learning." DESE, Program Review Report at 48.

  ii.    For students with disabilities who have had multiple behavioral problems, SPS "does not consider functional behavioral assessments or behavioral interventions, services or modifications to address the behavior so that it does not re-occur." *Id*. at 50.

    iii.      SPS "does not provide professional development to all staff on the mandated special education topics, including state and federal special education requirements, local policies and procedures for special education implementation, and methods of collaboration to accommodate diverse learning styles in the general education environment." *Id.* at 55-56.

    iv.      SPS removes students with disabilities from regular classrooms without appropriate justification; fails to provide these students with school-based behavior services; and denies children in the Public Day School the opportunity to participate in extra-curricular and vocational programs. *Id.* at 27-28.

45.    Defendants have not reasonably modified neighborhood schools to provide school-based behavior services for children with a mental health disability.  For students like S.S. and members of the class, the essential components of school-based behavior services, which Defendants fail to provide, are: (a) a comprehensive assessment, including determination of the purpose and triggers for the child's behavior; (b) a school-based intervention plan that relies on positive support, social skills training, a care coordinator, and adjustments as needed to curriculum or schedule; (c) training for school staff and parents in implementing the plan; and (d) coordination with non-school providers involved with the child (collectively, "school-based behavior services").

46.    There is a professional consensus that such school-based behavior services are necessary to afford children like S.S. and Plaintiff class members an equal opportunity to

advance academically and graduate and the opportunity to be educated in neighborhood schools along with their peers without a disability.

47.     Instead of providing these school-based behavior services, Defendants routinely transfer such students to the Public Day School, where they receive an inferior education and are separate from their peers.

**B.     Springfield's Public Day School**

48.     The Public Day School is exclusively for students with a mental health disability. It starts at kindergarten and extends through grade 12 (and up to age 21).  During the 2013-14 school year, of the 233 students reported to be in the Public Day School program, 42 were at the elementary level, 63 at the middle school level, and 128 at the high school level.

49.     The students in the Public Day School have many talents and strengths.  They have the same aspirations as other SPS students.  They have hobbies, enjoy sports, and would like to participate in extracurricular activities.  After they graduate from high school, they would like to get good jobs, and many would like to go to college.  Most have supportive families.

50.     Once transferred to the Public Day School, students remain in there for years.

51.     The dropout rate at the Public Day School is 41.1%, compared with the 6.5% overall dropout rate for SPS.

52.     Because SPS tells parents that the only viable educational setting for their child is the Public Day School, parents are left with little choice but to acquiesce to that placement.

53.     SPS often tells parents that their children need this segregated setting or their children will fail educationally.  SPS tells parents this even though children regularly drop out of the Public Day School because of its inferior education, punitive climate, and the high risk of arrest in the Public Day School.

54.     Defendants fail to provide Public Day School students and their parents any meaningful alternative to the Public Day School.

55.     The Public Day School is inferior to and separate from SPS's neighborhood schools.  Placement in the Public Day School needlessly segregates children from their peers without a disability.

56.     The Public Day School operates as little more than a "warehouse" for children with a mental health disability.  The Public Day School does not provide the same opportunities to learn that are provided to students without a disability.   Academic instruction is "dumbed down" and secondary to behavioral control based on the unwarranted assumption that children in the Public Day School are incapable of achieving academically at the same level as their peers without a disability.

57.     Children in the Public Day School have virtually no opportunity to engage in extracurricular activities.   Students are denied access to nearly all extracurricular activities available in the neighborhood schools, including afterschool sports and clubs and activities devoted to art, drama, poetry, student government, and various cultures.   They cannot play interscholastic sports against other schools within SPS or inter-district sports against teams from other school districts.  They do not have the opportunity to participate in SPS sponsored college, military,  and  job  informational  and  recruitment  activities  available  to  students  in  the neighborhood schools.

58.     School-based behavior services are largely unavailable to children in the Public Day School, which does not use effective and professionally accepted practices for managing and improving the behavior of children with a mental health disability.  Instead, the Public Day

School uses methods that interfere with their education and the ability to learn, and tend to exacerbate their mental health symptoms.

59.     Lacking adequate training and support, Public Day School staff often resort to harsh and counterproductive responses to students' behavior, including dangerous physical restraints (that risk serious injury or death), unnecessary forced isolation (sometimes for multiple days), and inappropriate arrests and suspensions for minor offenses.  The suspensions include formal out-of-school suspensions, in-school suspensions, and  "informal suspensions" (*e.g*., where the Public Day School staff call parents and tell them to remove their child from school for the remainder of the day).

60.     The Public Day School also relies heavily on the police for routine disciplinary matters.  The City has arranged with the Springfield Police Department for armed and uniformed police officers, known as the "Quebec Unit" to be on the Public Day School campuses.  Neither SPS nor the Police Department has adequately trained these officers to work effectively with students with a mental health disability.

61.     The police regularly arrest youth for infractions of school rules that elsewhere would be handled through school disciplinary procedures.

62.     In addition, Public Day School staff regularly use the police to impose severe discipline, such as physical restraints or placement in isolation rooms, for minor discipline issues such as not following directions or disrupting class.

### C.     *Plaintiff S.S.*

63.     S.S., who has experienced traumas in his life, is diagnosed with depression and attention deficit and hyperactivity disorder, among other conditions.  S.S. has a disability within

the meaning of the ADA.  His mental health condition substantially limits one or more major life activities, including developing and maintaining relationships.

64.    S.S. is a talented artist who especially likes drawing and theater.  S.S. is well organized and has a strong work ethic and keen sense of humor.  He enjoys spending time with his family and likes to help his mother with chores around the house and caring for his younger siblings.   He enjoys baking cakes, and going to parks, museums, amusement parks, and shopping.

65.    S.S. willingly and actively participates in treatment for his mental health disability.  He takes prescribed psychiatric medication and regularly participates in outpatient mental health therapy.  However, as a result of his mental health disability, S.S. sometimes in school talks out of turn, gets out of his seat, uses inappropriate language, or leaves class.  On rare occasions, he has fought with other students, mostly in response to being hit and/or bullied by other students.  On occasion, S.S. has responded physically to school staff when they tried to physically restrain him.

66.    SPS transferred S.S. to the Public Day School approximately five years ago, when he was in the fourth grade.  In the fall, S.S. will be a ninth grader.

67.    S.S. and his mother want S.S. to be educated in a neighborhood school, which is the most integrated setting appropriate to his needs.  Defendants have not offered S.S. any meaningful alternative to enrollment in the Public Days School.

68.    S.S. would like to play interscholastic sports, especially basketball, but such activities are not offered in the Public Day School.

69.    S.S. could be educated in a neighborhood school if SPS were to reasonably modify its programs and services and provide S.S. with school-based behavior services.

70. At the Public Day School, S.S. has been subjected to dangerous physical restraints, inappropriate forced isolation, and arrests and suspensions for minor offenses such as swearing, talking out of turn, and getting out of his seat. Staff at the Public Day School have enlisted police officers to help them physically restrain S.S. and to isolate him in a padded basement room, which, on at least one occasion, lasted for several days.

71. The Public Day School has not been effective in improving S.S.'s behavior in school. To the contrary, it has eroded his self-esteem and exacerbated his mental health symptoms.

72. SPS has a High School Choice program, which allows students to choose their high school through a balloting process. Each high school has its own character and a unique focus, such as vocational education or science and technology.

73. Although S.S. wants to participate in the balloting process to choose his high school, as a student in the Public Day School, he is barred from doing so.

74. By not educating S.S. in a neighborhood school, and relegating him to the inferior Public Day School, Defendants have denied S.S. equal educational opportunity and the opportunity to be educated in the most integrated setting in violation of the ADA.

### D.     The Plaintiff Class

75. S.S. is not alone in his experiences in the Public Day School. It is a situation endured by hundreds of similar children who also have a mental health disability. The Plaintiff class of children who are placed in or will be placed in the Public Day School suffer the same injuries and require the same relief as Plaintiff S.S.

76. Defendants are denying not only Plaintiff S.S. but also the Plaintiff class equal educational opportunity and the opportunity to be educated in SPS's neighborhood schools.

77.     Without school-based behavior services, Plaintiff S.S. and the Plaintiff class will not have the same opportunity as their peers without a disability to learn and graduate, or to be educated in SPS's neighborhood schools.   However, Defendants have failed to reasonably modify SPS's programs and services to provide S.S. and the Plaintiff class with school-based behavior services.

78.     Through the acts and omissions described above, Defendants are:

    i.    Denying S.S. and the Plaintiff class the opportunity to participate in and benefit from educational services that are equal to those afforded other students;

    ii.    Denying S.S. and the Plaintiff class educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

    iii.    Denying S.S. and the Plaintiff class the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs;

    iv.    Failing to reasonably modify SPS's programs and services as needed to avoid discrimination against S.S. and the Plaintiff class; and

    v.    Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs with respect to S.S. and the Plaintiff class.

## COUNT I

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

79.     Plaintiffs re-allege the allegations in all preceding paragraphs as though fully set forth herein.

80.     Plaintiff S.S. and the members of the Plaintiff class, who include PPAL constituents, are individuals with a disability within the meaning of the ADA.  Their mental health condition substantially limits one or more major life activities, including developing and maintaining relationships.

81.     As school-age children, they are qualified to participate in Defendants' educational programs and services.  42 U.S.C. § 12131(2).

82.     Defendants the City of Springfield and SPS are public entities within the meaning of the ADA and Defendants Sarno and Warwick are officials responsible for running these public entities and supervising their operations.  42 U.S.C. § 12131(1).

83.     Through the acts and omissions described above, Defendants are violating Title II of the ADA by:

   a.     Denying S.S. and the Plaintiff class an opportunity to participate in and benefit from educational services that is equal to that afforded other students;

   b.     Denying S.S. and the Plaintiff class educational services that are as effective in affording equal opportunity to obtain the same result, gain the same benefit, or reach the same level of achievement as that provided other students;

    c.      Denying S.S. and the Plaintiff class the opportunity to receive educational programs and services in the most integrated setting appropriate to their needs;

    d.      Failing to reasonably modify SPS's programs and services as needed to avoid discrimination against S.S. and the Plaintiff class; and

    e.      Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of Defendants' educational programs with respect to S.S. and the Plaintiff class.

84.     Granting relief to Plaintiffs would not fundamentally alter Defendants' programs, services, and activities.

85.     The acts and omissions of Defendants have caused and will continue to cause S.S. and the Plaintiff class, who include PPAL constituents, to suffer irreparable harm, and they have no adequate remedy at law.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs pray that the Court grant the following relief:

A.     Order that Plaintiff S.S. may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure.

B.     Order and declare that Defendants are violating the rights of S.S. and other similarly situated children under Title II of the ADA, 42 U.S.C. § 12101, *et seq*., and its implementing regulations.

C.     Preliminarily and permanently enjoin Defendants, their successors in office, agents, employees and assigns, and all persons acting in concert with them to provide Plaintiff S.S. and the Plaintiff class with the school-based behavior services they need to enjoy equal educational opportunity and receive educational programs and services in the most integrated setting, as required by Title II of the ADA

D. Award Plaintiffs' attorneys' fees and costs as appropriate and permitted by law, including pursuant to 42 U.S.C. § 12205.

E. Any other relief as this Court finds just and proper.

Dated:  June 27, 2014

Respectfully submitted,

**S.S., a minor, by his mother, S.Y., on behalf of himself and other similarly situated students, and the Parent/Professional Advocacy League,**

By their Attorneys,

*Of Counsel\*:*

Deborah A. Dorfman, BBO # 625003
Samuel Miller, BBO # 624969
**CENTER FOR PUBLIC REPRESENTATION**
22 Green Street
Northampton, MA 01060
(413) 586-6024
ddorfman@cpr-ma.org
smiller@cpr-ma.org

Ira Burnim
Jennifer Mathis
**BAZELON CENTER FOR MENTAL HEALTH LAW**
1101 15th Street, N.W., Suite 1212
Washington, D.C. 20005
(202) 467-5730
jenniferm@bazelon.org
irab@bazelon.org

*\*pro hac vice applications forthcoming*

  */s/ Carol E. Head*
Robert E. McDonnell, BBO # 331470
Carol E. Head, BBO # 652170
Elizabeth M. Sartori, BBO # 672577
Jacqueline S. Delbasty, BBO # 676284
**BINGHAM McCUTCHEN LLP**
1 Federal Street
Boston, MA 02110
(617) 951-8000
robert.mcdonnell@bingham.com
carol.head@bingham.com
elizabeth.sartori@bingham.com
jacqueline.delbasty@bingham.com

Robert Fleischner, BBO # 171320
**CENTER FOR PUBLIC REPRESENTATION**
22 Green Street
Northampton, MA 01060
(413) 586-6024
rfleischner@cpr-ma.org