## UNITED STATES DISTRICT COURT

### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| S.S., a minor, by his mother, S.Y., on behalf of himself and other similarly situated students; the PARENT/PROFESSIONAL ADVOCACY LEAGUE; and the DISABILITY LAW CENTER, | * * * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 14-30116-MGM |
| CITY OF SPRINGFIELD, MASSACHUSETTS; DOMENIC SARNO, in his official capacity as Mayor of City of Springfield; SPRINGFIELD PUBLIC SCHOOLS; DANIEL J. WARWICK, in his official capacity as Superintendent of Springfield Public Schools, | * * * * * * | |
| Defendants. | * | |

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTION TO DISMISS
(Dkt. No. 33)
November 19, 2015

MASTROIANNI, U.S.D.J.

## I.      Introduction

This case requires the court to consider whether Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, imposes obligations on public school districts with respect to the educational placement of students with disabilities that are independent of the obligations imposed by the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400. Plaintiffs, the Parent/Professional Advocacy League, the Disability Law Center and parent S.Y., have brought this action against the City of Springfield, its Mayor, Domenic Sarno, the Springfield Public Schools

("SPS"), and its superintendent, Daniel J. Warwick (collectively "Defendants")[1] on behalf of S.Y.'s child S.S. and other school-age children with mental health disabilities who are, or have been enrolled at the Springfield Public Day School ("SPDS"), and do not currently attend SPS neighborhood schools. Plaintiffs allege that students placed at the SPDS because of their disabilities are denied their rights to participate equally in the educational programs offered by SPS, in violation of Title II of the ADA. Though Plaintiffs have styled this action as a class action, no class has yet been certified. With respect to S.S., Plaintiffs have not appealed an earlier administrative decision finding that Defendants met their obligations to S.S. under the IDEA.

Defendants have moved to dismiss Plaintiffs' claim, arguing that Plaintiffs' acquiescence to earlier administrative decision forecloses any separate claim under the ADA related to the appropriateness of the educational placement at SPDS. Separately, Defendants also argue (1) Plaintiffs failed to exhaust administrative remedies; (2) Plaintiffs' claim is not subject to the ADA's private right of action; and (3) the ADA does not permit claims against individuals, even when sued in their official capacity. The court first summarizes the relevant statutory background, then sets out the factual and procedural history of this case before proceeding to analyze the sufficiency of Plaintiffs' claim under Title II of the ADA.

## II.        Statutory Background

A.        <u>IDEA</u>

"Congress designed the IDEA as part of an effort to help states provide educational services to disabled children." *C.G. ex rel. A.S. v. Five Town Cmty. Sch. Dist.*, 513 F.3d 279, 284 (1st Cir. 2008). The IDEA "establishes a basic floor of education," requiring school districts that receive federal funds to provide "[a] free appropriate public education," or FAPE, to children with disabilities.

---

[1] Mayor Sarno and Superintendent Warwick are sued only in their official capacities.

*Burlington v. Dept. of Educ.*, 736 F.2d 773, 788-89 (1st Cir. 1984); 20 U.S.C. § 1412(a)(1)(A).[2] The regulations implementing the IDEA further require that FAPE be provided in "the least restrictive environment" ("LRE"), such that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are nondisabled." *See* 34 C.F.R. § 300.114. Under the IDEA, a school district is not "under a compulsion to afford a disabled child an ideal or an optimal education," but only to "provide an adequate and appropriate education" *C.G.*, 513 F.3d at 284.

The FAPE required by the IDEA is tailored to the needs of a disabled child through the creation and implementation of an "individualized educational program" ("IEP"). *Bd of Educ. of Hendrick Hudson Central Sch. Dist. of Westchester Cty. v. Rowley*, 458 U.S. 176, 181-82 (1982). An extensive set of procedural safeguards grant parents or guardians the right to participate in the meetings that lead to the development of the IEP and give them a mechanism to challenge the IEP before an impartial "state educational agency."[3] *Rowley,* 458 U.S. at 182-83.; *see also* 20 U.S.C. § 1415 (f)-(g). In Massachusetts, the "state educational agency" is the Bureau of Special Education Appeals ("BSEA"). *See Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 58-59 (1st Cir. 2002) (citing 603 MASS. CODE REGS. § 28.08). A party who proceeds through the state administrative procedure and is "aggrieved by the findings and decision" of the independent hearing officer ("IHO") can bring a civil action in federal court. 20 U.S.C. § 1415(i)(2). By the same token, a party who fails to exhaust the administrative review process set forth in the IDEA is foreclosed from pursuing their IDEA claim in federal court. *Id.*; *see also D.B. ex rel Elizabeth B. v. Esposito*, 675 F.3d 26, 39 n. 5 (1st Cir. 2012). Additionally, and of particular relevance in this case, parties seeking remedies under other federal laws protecting the rights of children with disabilities, including the ADA, must also exhaust

---

[2] Though Massachusetts passed legislation designed to ensure the "maximum possible development" of disabled children prior to the passage of the IDEA, the state subsequently amended its statute to conform with the federal standards for FAPE. *See* 2000 Mass. Acts ch. 159.

[3] Both parents and school districts can make a complaint related to the provision of FAPE to a child. 20 U.S.C. § 1415(b)(6).

the procedural remedies available under the IDEA before they can proceed in district court.[4] 20

U.S.C. § 1415(l). The First Circuit has recognized that exhaustion is mandatory in such cases, even

though a party might seek relief that "is not available in the administrative venue." *Frazier*, 276 F.3d

at 62.  Mandatory exhaustion in such cases is both consistent with the legislative intent of the IDEA

and practical because it "facilitate[s] the development of a useful record." *Id.* Finally, although the

IDEA requires parties to fully exhaust its administrative procedures before filing claims brought

under other provisions of federal law, the exhaustion requirement of "'the IDEA does not restrict

rights and remedies that were already independently available through other sources of law.'"

*Esposito*, 675 F.3d at 39 (citing *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006).


B.    ADA

       "Title II [of the ADA] imposes an affirmative obligation on public entities to make their

programs accessible to qualified individuals with disabilities, except where compliance would result

in a fundamental alteration of services or impose an undue burden." *Toledo v. Sanchez*, 454 F.3d 24,

32 (1st Cir. 2006). Unlike the IDEA, which creates a narrowly-tailored entitlement, the ADA is a

broadly applicable civil rights statute "designed to provide comprehensive protection for disabled

individuals against discrimination based on their disabilities." *Theriault v. Flynn*, 162 F.3d 46, 47-48

(1st Cir. 1998). Pursuant to Title II of the ADA, no "qualified individual with a disability" shall "by

reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42

U.S.C. § 12132. The ADA directs the Attorney General to promulgate regulations to implement

---

[4] After the Supreme Court ruled the predecessor statute to the IDEA was the sole remedy available in cases brought by disabled students seeking special educational services, Congress amended the IDEA to clarify its intention that children with disabilities continued to be protected by federal laws that predated the IDEA and to require exhaustion of the IDEA's administrative remedies prior to filing suit under another provision of federal law. *Diaz-Fonseca v. Puerto Rico*, 451 F.3d 13, 29 (1st Cir. 2006).

Title II. *Id.* at § 12134. These regulations are broken up into several categories, including one which sets forth "General Requirements." 28 C.F.R. §§ 35.130-39. The first of this group sets forth general prohibitions against discrimination, including that "[n]o qualified individual with a disability shall, on the basis of disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any public entity." 28 C.F.R § 35.130(a). When a public entity provides an "aid, benefit, or service," the regulation also specifies that it cannot, on account of disability, give disabled individuals an "opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(ii). Though the obligations on public entities are described expansively, they are not without limits. A public entity is not required to provide accommodations if it "can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also* 42 U.S.C. § 12182(b)(2)(A)(ii).

Individuals who experience discrimination that violates Title II of the ADA are empowered by a private right of action to bring their own discrimination suits and vindicate their rights. 42 U.S.C. § 12117; *see also Parker v. Universidad de Puerto Rico*, 225 F.3d 1, 8 (1st Cir. 2000) ("Title II . . . adopts the remedial scheme of Title VI of the Civil Rights Act of 1964 . . . ."). This private right of action extends to allow enforcement of a regulation, provided the regulation "simply effectuates an express mandate contained in the organic statute." *Iverson v. City of Boston*, 452 F.3d 94, 101 (1st Cir. 2006). If the regulation "announces an obligation or a prohibition not imposed by the organic statute," relief is not available through the private right of action. *Id.*

"To state a claim for a violation of Title II, a plaintiff must allege: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) such exclusion, denial of benefits or discrimination was by reason of his disability."

5

*Toledo*, 454 F.3d at 31. Where the facts underlying the claims relate to special education services, the plaintiffs must also demonstrate they have exhausted the administrative remedies available under the IDEA. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 118 (1st Cir. 2003). Exhaustion is complete at the conclusion of the administrative hearing; a party is not required to seek judicial review of all portions of the resulting administrative action. *Id.*

For purposes of Title II, a person is a "qualified individual with a disability" if "with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, [the person] meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity." 42 U.S.C. § 12131(2). When determining whether a person is a "qualified individual with a disability" with respect to an academic program, the First Circuit directs courts to consider whether the person "is able to meet all of a program's requirements *in spite of*" the person's disability. *Bercovitch v. Baldwin Sch., Inc.*, 133 F.3d 141, 154 (1st Cir. 1998) (interpreting the Title III requirement that an individual be "otherwise qualified" after finding no meaningful distinction between that phrase and the Title II requirement that a person be a "qualified individual with a disability") (emphasis in original). If there are reasonable modifications that would allow a school to accommodate a disabled individual, the individual is qualified for the program offered by the school. *Cf. id.*

### III.   Legal Standard

A party moving to dismiss an action pursuant to Rule 12(b)(6) has the burden of demonstrating that the complaint lacks "sufficient factual matter" to state a claim for relief that is actionable as a matter of law and "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); Fed.R.Civ.P. 12(b)(6). "A claim has

facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Though "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," once a plaintiff has put forth "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal* at 679. To succeed on a motion to dismiss, the moving party must show the other party's assertions fall short of establishing at least one "element necessary to sustain recovery under some actionable legal theory." *Centro Medico del Turabo, Inc. v. Feliciano de Melecio,* 406 F.3d 1, 6 (1st Cir. 2005) (internal citation omitted). If a plaintiff has sufficiently alleged conduct that violated Title II of the ADA, the court cannot dismiss a case for failure to state a claim; this is true even though a defendant "may ultimately be able to negate the charges of discrimination" or show that accommodations sought by the plaintiff are not reasonable. *Toledo*, 454 F.3d at  32.

## IV.    Plaintiffs' Allegations

SPS operates both neighborhood schools and the SPDS.[5] (First Am. Compl. ("Am. Compl.") ¶ 2, Dkt. No. 55.) Approximately 230 students in grade K through 12, all of whom have mental health disabilities, attend the SPDS. (*Id.* ¶ 63.) In addition sometimes students attending the SPDS are enrolled in a separate, even more restrictive program within the SPDS known as the Learning Center ("LC"). (March 27, 2014 BSEA Ruling ("Ruling") 6, Dkt. No. 34-1.)[6]

---

[5] Defendants object to Plaintiffs' use of the singular Public Day School to refer to a group of three programs, existing on three separate campuses, and considered, at least for some purposes, to be separate schools. At this stage in the litigation, the court finds no need to distinguish among the programs and so uses the singular to refer collectively to the elementary, middle, and high school Public Day School programs. The court's choice of terms to refer to the Public Day School programs does not reflect a formal determination that they comprise a single school. The court leaves the determination of whether there are three Springfield Public Day Schools or only one until such time as a relevant legal analysis requires a decision.

[6] In addition to relying on the allegations contained in Plaintiffs' complaint, the court relies on the findings made by the IHO. Plaintiffs were required to obtain the BSEA decision prior to filing suit and have elected not to appeal it. Consistent with the purposes behind the exhaustion requirement, the court therefore finds that consideration of

SPS Students attending neighborhood schools have access to a range of extracurricular activities. (Am. Compl. ¶ 68.) By contrast, the SPDS offers few extracurricular opportunities and students attending the SPDS are not permitted to participate in most extracurricular activities offered in the neighborhood schools. (*Id.*) Students at the SPDS are also provided with less challenging academic instruction than is provided in the neighborhood schools. (*Id.* ¶ 67.) In addition, students attending the SPDS are disproportionately subjected to punitive, and even dangerous, discipline when compared to students attending neighborhood schools. (*Id.* ¶¶ 69-72.) Even minor infractions by students attending the SPDS, such as not following directions or disrupting class, often result in severe punishments imposed by police officers rather than educators, including physical restraints or placement in isolation rooms. (*Id.* ¶ 73.) This harsh discipline is not provided in a manner that is consistent with a therapeutic learning environment. (*Id.* ¶¶ 3-4.) The students who attend the SPDS could attend neighborhood schools if SPS reasonably modified the programs and services it provides to include the provision of appropriate school-based behavior services within those neighborhood schools. (*Id.* ¶ 7.) The school-based behavior services requested by Plaintiffs include (1) comprehensive assessments of the purpose and triggers of children's disruptive behaviors, (2) development of school-based intervention programs that rely on positive support, social skills training, care coordinators, and curriculum and schedule adjustments, (3) plan implementation training for staff and parents, and (4) coordination between the school and non-school service providers. (*Id.* ¶ 60.)

S.S. has a mental health disability within the meaning of the ADA. (*Id.* ¶ 74.) He also is a student of average intelligence who enjoys drawing, cooking, and other non-academic tasks. (*Id.* ¶

---

information contained in the BSEA decision is appropriate at this stage. *See Frazier*, 276 F.3d at 62-63. Additionally, because of the exhaustion requirement, the court considers the BSEA decision to be a "document[] sufficiently referred to in the complaint" that is "central to plaintiffs' claims." *See Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

75.) He was transferred by SPS from a neighborhood school to the SPDS when he was in the fourth grade. (*Id.* ¶ 77.) While attending the SPDS, S.S. was segregated from his non-disabled peers and "subjected to dangerous physical restraints, inappropriate forced isolation, suspensions, threatened arrests, and arrests for minor offenses such as swearing, talking out of turn, and getting out of his seat." (*Id.* ¶ 80.) On at least one occasion, S.S. spent several consecutive school days isolated in a padded basement room. (*Id.*) If SPS made school-based behavior services available at its neighborhood school, S.S. could be safely and appropriately educated in one of SPS's neighborhood schools. (*Id.* ¶ 79.)

While only students with emotional disabilities are enrolled at the SPDS, not all SPS students with mental health disabilities attend the SPDS. (*Id.* at ¶ 63; Ruling 5-6.) SPS also provides programs for students with mental health disabilities in its neighborhood schools. (Ruling 3.) One program SPS offers is known as the Social Emotional Behavioral Supports ("SEBS") program. During his eighth grade year, S.S. attended the SEBS program at a neighborhood middle school for a forty-five day trial. (*Id.* at 2.) At the end of the 45-day period, S.S. returned to the SPDS. (*Id.*)

In addition to bringing this suit on behalf of S.S., Plaintiffs seek to bring this action on behalf of "[a]ll students with a mental health disability who are or have been enrolled in [the SPDS] who are not being educated in an SPS neighborhood school." (Am. Compl. ¶ 39.) Like S.S., the other members of the proposed plaintiff class, have endured similar treatment at the SPDS. (*Id.* ¶ 84.)  These other students also could be educated alongside their non-disabled peers within neighborhood schools if SPS made reasonable accommodations and provided school-based behavior services to the students within neighborhood schools. (*Id.* ¶ 87.)

## V.    Procedural History

A Request for Hearing with the BSEA was filed on behalf of S.S. and a class of similarly situated students on June 18, 2013, and an Amended Request was filed on July 22, 2013.[7] (Am. Compl.¶ 14.) The request sought injunctive and declaratory relief for alleged violations of the ADA due to SPS's failure to "reasonably modify its programs and services to ensure that [S.S.] and members of the class are afforded equal educational opportunity." (*Id.*) Specifically, S.S. asserted he and other members of the proposed class should be provided with "an education that is equal to and as effective as that provided other students" and should be educated in the most integrated setting appropriate to their needs. (*Id.*) S.S. also asserted claims pursuant to the IDEA.[8] (*Id.* ¶ 18.)

In a decision dated March 27, 2014, the IHO dismissed the ADA claims asserted by S.S., citing an absence of jurisdiction. (*Id.* ¶ 16.) As to S.S.'s IDEA claims, the IHO ruled the IEP SPS had provided to S.S. was reasonably calculated to provide S.S. with FAPE. Plaintiffs have not appealed the BSEA decision with respect to S.S.'s IDEA claims. (*Id.* ¶ 19.) In reaching his decision, the IHO first determined that S.S. could not have been provided FAPE within the constraints of the existing SEBS program he attended on a trial basis. (Ruling 7.)

Plaintiffs S.Y. and The Parent/Professional Advocacy League filed this suit on June 27, 2014, asserting only one claim: violation of the ADA. (Complaint ¶¶ 79-83, Dkt. No. 1.) The Disability Law Center was later added as a plaintiff. (Am. Compl. ¶ 23.) Defendants filed their Motion to Dismiss in July of 2014. (Dkt. No. 33.) In December of 2014, Plaintiffs sought leave to file an amended complaint. (Dkt. No. 48.) The court granted leave and the amended complaint (hereinafter, simply "Complaint") was filed in February of 2015. (Dkt. No. 55.) A hearing on the Motion to Dismiss was held on May 13, 2015.

---

[7] The court notes that the BSEA ruling lists the filing dates as June 20, 2013 and July 24, 2013, a two-day discrepancy from the dates listed in the Complaint. (Ruling 2, Dkt. No. 34-1.)
[8] In addition, S.S. asserted a claim under Section 504 of the Rehabilitation Act of 1973 ("Section 504"), codified at 29 U.S.C. § 794. (First Am. Compl. ¶ 18, Dkt. 55.)

## VI.      Jurisdiction

Plaintiffs have brought a single claim in which they allege violations of the ADA, a federal

statute. This court therefore has subject matter jurisdiction in this case under 28 U.S.C. § 1331.

Jurisdiction does not depend on Plaintiffs' proper exhaustion of administrative remedies. "The

requirement that plaintiffs exhaust administrative remedies under the IDEA is not absolute." *Frazier*,

276 F.3d at 59. The failure of a plaintiff to exhaust under the IDEA does not deprive the court of

jurisdiction, but rather provides the court with grounds for dismissal for failure to state a claim. *Id.* at

69.


## VII.      Analysis

A.      ADA or IDEA

Much of the parties' briefing in this case addresses Defendants' argument that Plaintiffs'

ADA claim is not actually an ADA claim, but rather a disguised IDEA claim. Defendants' rely on

the opinion of Magistrate Judge Neiman in *I.M. ex rel. C.C. v. Northampton Public Schools*, 869 F. Supp.

2d 174 (D. Mass. 2012), to support their position. Plaintiffs, supported by a statement of interest

filed by the Department of Justice ("DOJ") (Dkt. No. 40), argue a special education student may

agree there has been no violation of the IDEA and yet may also be able to assert a claim under the

ADA because the statutes are not coextensive. This court agrees with the position of Plaintiffs and

the DOJ,[9] with respect to the distinct rights and remedies provided under the two statutes; it also

disagrees with Defendant's reading of *I.M.* as articulating an opposing interpretation.

The plaintiffs in *I.M.* were parents of a child with significant disabilities who had received

special education services pursuant to an IEP. *I.M.*, 869 F. Supp. 2d at 176-77. During the relevant

---

[9] As the entity tasked with promulgating regulations implementing the ADA, the DOJ's position with respect to the meaning and scope of the statute and its regulations is entitled to deference under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).

period, some of the services provided in the IEP were not properly delivered to the student, including services related to a communication device. *Id.* at 179. The parents appealed a decision of the BSEA finding that the IEP had been adequate. *Id.* at 176. They also brought a separate claim under the ADA related to the defendant school district's failure to provide the communication device in a timely manner. *Id.* at 185-86.

After analyzing the IDEA claim in detail, Judge Neiman ruled that the IEP had offered the student FAPE and that the implementation issues were largely the fault of the parents. *Id.* at 185. He then dismissed the ADA claim due to both the failure to exhaust and because plaintiffs had not adequately pled evidence of "disability based animus." *Id.* at 185, 188. At no point in his decision did Judge Neiman suggest that any ADA claim asserted by a student whose educational placements is set out in an IEP must be viewed instead as an IDEA claim. *Id.* at 187. Instead, he specifically noted that plaintiffs are permitted to pursue claims under the ADA "even if such claims 'invoke either the substance or the implementation of' the IDEA." *Id.* (quoting *Esposito*, 675 F.3d at 40). Whether such a claim can survive a motion to dismiss depends on several factors.

Plaintiffs here, unlike those in *I.M.*, have not appealed the BSEA's decision regarding the IDEA and have instead focused on the separate requirements of the ADA. Given the posture of this case, the court finds it unnecessary to further consider whether some aspects of the ADA claim may be similar to some aspects of a hypothetical IDEA claim Plaintiffs chose not to pursue. The court instead turns its attention to the question of whether Plaintiffs have sufficiently asserted a prima facie case under Title II of the ADA. *See Toledo*, 454 F.3d at 31.

B.    Exhaustion

Defendants have argued that Plaintiffs claim is not properly before this court because Plaintiffs were required to seek judicial review of the BSEA's ruling on the IDEA claim in order to properly exhaust their ADA claim under the IDEA. To the extent Defendants' exhaustion argument

repackages their broader assertion that an ADA claim related to an educational placement cannot succeed unless the placement also violated the IDEA, the argument must fail at this stage because the protections offered by the two statutes are not coextensive. As to whether, as a purely procedural matter, the IDEA exhaustion requirement includes seeking judicial review of an IDEA decision, the First Circuit has clearly answered no. Plaintiffs were required to exhaust certain administrative procedures under the IDEA prior to filing a civil action to pursue their ADA claim. 20 U.S.C. § 1415(l). Specifically, Plaintiffs were required to obtain a decision from a State educational agency, in this case, the BSEA, following an impartial due process hearing 20 U.S.C. § 1415(f), (g). Once they obtained that decision, they were not required to seek judicial review of the party's IDEA claim prior to filing a judicial action to pursue their rights under the ADA. *See Nieves-Marquez*, 353 F.3d at 118. Defendant's argument as to Plaintiffs' failure to exhaust must therefore fail.

C.    Prima Facie Case

The main area of contention between the parties with respect to whether Plaintiffs have asserted adequate facts to state a prima facie case relates to Plaintiffs' ability to establish the first element: S.S. is a qualified individual with a disability. In order to state a claim under Title II, Plaintiffs must allege: (1) S.S. "is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) such exclusion, denial of benefits or discrimination was by reason of his disability." *Toledo*, 454 F.3d at 31. Defendants argue the BSEA finding that S.S. had been provided with FAPE in the LRE conclusively establishes that S.S. was not a qualified individual with a disability.

13

The parties agree that S.S. suffers from a mental health disability which causes him to be disabled for purposes of the Title II of the ADA. Where the parties diverge is whether S.S. is qualified to attend an SPS neighborhood school. The First Circuit advises that "if more than reasonable modifications are required of an institution in order to accommodate an individual, then that individual is not qualified for the program." *Bercovitch*, 133 F.3d at 154. Defendants argue that the BSEA's ruling that S.S. received FAPE in the LRE when he attended SPDS and that he did not receive FAPE when he attended the SEBS program at a neighborhood school conclusively establishes the accommodations requested by Plaintiffs required a substantial alteration to the programs offered by SPS.

There is a certain logic to Defendants' assertion. By choosing not to appeal the BSEA decision on the IDEA claims, Plaintiffs have acquiesced to its ruling that S.S., even when placed in a segregated environment exclusively with other students with mental health disabilities, was provided with FAPE in the LRE and was not provided with FAPE when he was placed in a less restrictive program at a neighborhood school. From this, Defendants ask the court to infer that a fundamental alteration of the programs offered by the neighborhood schools is necessary in order for S.S. to receive FAPE in an SPS neighborhood school and, therefore, S.S. is not a qualified disabled individual. While the substance of the BSEA ruling might suggest just such a conclusion and a fully developed record might require as much on a motion for summary judgment, the facts pled cannot justify such an inference at this stage. *See Toledo*, 454 F.3d at 32. The complaint clearly alleges that S.S. has not been provided with school-based behavioral services in a neighborhood school, and based on the way the school-based behavioral services are described in the complaint, the court can reasonably infer that, considered in the full context of the educational programs offered by SPS, the modifications required to offer the school-based behavioral services are reasonable, rather than substantial. Since Plaintiffs have alleged facts from which such an inference can be made, they have

also satisfactorily pled that S.S. was a qualified individual with a disability, thus establishing the first

element of an ADA claim. *Bercovitch*, 133 F.3d at 154.

As to the second element, Plaintiffs assert S.S. was excluded from attending neighborhood

schools and that his exclusion prevented him from (1) receiving academic instruction at the level

provided to students attending neighborhood schools, (2) participating in the extracurricular

activities offered at the neighborhood schools, and (3) receiving safe and appropriate disciplinary

interventions. Defendants take issue with the accuracy of many of Plaintiffs' allegations, but since, at

this stage, the court accepts as true the facts alleged in the complaint and draws all reasonable

inferences in Plaintiffs' favor we find they have adequately pled the second element. Finally, it is

undisputed that the exclusion of S.S. from neighborhood schools occurred when he was enrolled at

the SPDS. Since only students with mental health disabilities are enrolled at the SPDS, Plaintiffs

have adequately pled that the exclusion of S.S. from the neighborhood schools was by reason of his

disability. *Cf. Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 597, 600 (recognizing that "unjustified

institutional isolation of persons with disabilities is a form of discrimination" by reason of disability).

As Plaintiffs have pled sufficient facts to make a prima facie showing as to each element of their

ADA claim, dismissal for failure to state a claim is inappropriate.


D.     Private Right of Action

Relying on the First Circuit's decision in *Iverson v. City of Boston*, Defendants' argue that the

court must dismiss Plaintiffs' claim because their claim does not allege a direct violation of Title II

and cannot, therefore, be enforced with the private right of action created by Title II. 452 F.3d 94

(1st Cir. 2006). Predictably, Plaintiffs distinguish their claim from the regulatory noncompliance

claim at issue in *Iverson*. As the First Circuit explained in *Iverson*, Title II creates a private right of

action that can be used to enforce the provisions set out in the statute, but which cannot be used to

enforce regulations that impose burdens that do not exist under the statute. *Id.* at 100 (citing *Alexander v. Sandoval*, 532 U.S. 275 (2001)). In *Iverson*, the plaintiff alleged only violations of the specific requirements of the evaluation and transition plan regulations, but did not separately allege that failure to comply with the regulations was itself a violation of Title II. *Id.* On the other hand, the First Circuit recognized that a private right of action would likely have been available had the plaintiff sought to enforce a regulation that "effectuate[d] an express mandate contained in the organic statute." *Id.* at 100-01.

Such is the case here. Plaintiffs have alleged that Defendants discriminated against S.S. in violation of Title II by placing S.S. in a segregated educational environment even though, had he been provided with reasonable accommodations, he could have been placed in a neighborhood school. In making their claim they refer to 28 C.F.R. § 35.130 because that regulation lists activities which are discrimination under the statute. The language of the statute prohibits discrimination on the basis of disability and the regulation gives examples of what that prohibition means without creating a new category of obligations. The court therefore agrees with Plaintiffs and recognizes their claim is one to which the private right of action attaches.

E. <u>Dismissal of Claims Against Individual Defendants</u>

Finally, Defendants argue the claim brought by Plaintiffs can be asserted only against a public entity and, therefore, the individual defendants who have been sued in their official capacities should be dismissed from this case. Defendants have cited no authority for this position other than the language of the statute, which refers to a "public entity." Claims against individual defendants may well be permissible under the ADA. *See Henrietta D v. Bloomberg*, 331 F.3d 261, 287-88 (2d Cir. 2003) (finding an individual, sued in her official capacity, subject to suit under the ADA). On the other hand, "[a] suit against a public official in his official capacity is a suit against the governmental

16

entity itself." *Suprenant v. Rivas*, 424 F.3d 5, 19 (1st Cir. 2005). As Plaintiffs have also sued the public entities that employ the individual defendants and these entities are not state entities potentially entitled to Eleventh Amendment immunity, the claims against the individuals are redundant. *Decotiis v. Whittemore*, 635 F.3d 22, 38 n. 19 (1st Cir. 2011). Thus, for reasons other than those advanced by Defendants, the court will dismiss the claims asserted against the individual defendants.

## VIII.    Conclusion

For the Foregoing reasons, the court DENIES Defendants' Motion to Dismiss as to the claims against Defendants City of Springfield and Springfield Public Schools and ALLOWS the motion as to the claims against Defendants Domenic Sarno and Daniel J. Warwick.

It is So Ordered.

   /s/ Mark G. Mastroianni
MARK G. MASTROIANNI
United States District Judge