UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| S.S., a minor, by his mother, S.Y., on behalf of | * | |
| himself and other similarly situated students; the | * | |
| PARENT/PROFESSIONAL ADVOCACY | * | |
| LEAGUE; and the DISABILITY LAW CENTER, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | |
| | * | Civil Action No. 14-30116-MGM |
| CITY OF SPRINGFIELD, MASSACHUSETTS; | * | |
| DOMENIC SARNO, in his official capacity as | * | |
| Mayor of City of Springfield; SPRINGFIELD | * | |
| PUBLIC SCHOOLS; DANIEL J. WARWICK, in | * | |
| his official capacity as Superintendent of Springfield | * | |
| Public Schools, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER ON PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION AND DEFENDANTS'
MOTIONS TO EXCLUDE OR LIMIT AND FOR EVIDENTIARY HEARING
(Dkt. Nos. 96, 162, and 171)
December 16, 2016

MASTROIANNI, U.S.D.J.

## I.   INTRODUCTION

Plaintiffs bring this proposed class action on behalf of all students who have been diagnosed

with mental health disabilities and enrolled not in a neighborhood school but in one of several

schools operated by Defendant, Springfield Public Schools ("SPS"), and collectively referred to in

this litigation as the Springfield Public Day School ("SPDS"). "Neighborhood school" is a term used

in this litigation to refer to elementary and middle schools which primarily enroll students based on

their residential address and high schools which enroll students through the High School Choice Plan. Each student enrolled at the SPDS has been formally diagnosed with a mental health disability. Plaintiffs assert students attending the SPDS are not only segregated from nondisabled students, but also receive educational services that are demonstrably inferior to those offered at neighborhood schools, are unable to access extracurricular activities available at neighborhood schools, and are subjected to dangerously punitive discipline.

Plaintiffs' allegations paint a picture of the SPDS which is both troubling and vigorously disputed by Defendants. Despite the concerning allegations, Plaintiffs have not brought claims arising directly from the operation of the SPDS, including claims Defendants failed to provide students who attended SPDS with educational services that met the requirements of the Individuals with Disabilities in Education Act ("IDEA"), 20 U.S.C. § 1400, *et seq.* Instead, Plaintiffs contend Defendants violated Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, *et seq.*, by adopting a policy and practice of not providing students with mental health disabilities with necessary services in neighborhood schools. As a result of that policy or practice, a portion of students with mental health disabilities have been segregated at the SPDS, rather than attending neighborhood schools where they could have access to educational services that is equal to that enjoyed by non-disabled students.

Specifically, Plaintiffs assert Defendants enrolled members of the proposed class at the SPDS rather than offer services in those neighborhood schools that would enable members of the proposed class to be educated in neighborhood schools. Central to Plaintiffs claims are their contentions, supported by the opinions of Dr. Peter Leone, Plaintiffs' proffered expert, that Defendants have violated the ADA by failing to offer "school-based behavior services" or "SBBS" in its neighborhood schools and that all members of the proposed class would be able to attend

neighborhood schools if SBBS were offered. Plaintiffs thus seek an order compelling Defendants to provide SBBS in its neighborhood schools.

On November 19, 2015, this court denied Defendants' motions to dismiss. (Dkt. No. 102.) Prior to the court's ruling, Plaintiffs filed their Motion for Class Certification (Dkt. No. 96). Following a period of discovery, the parties filed supplemental briefing on the Motion for Class Certification in July and August of 2016. Defendants subsequently filed a Motion to Exclude or Limit the Testimony of Peter Leone, Plaintiffs' proffered expert (Dkt. No. 162), and a separate Motion for an Evidentiary Hearing (Dkt. No. 171), which Plaintiffs have opposed. For the reasons discussed below, Plaintiffs' motion will be denied and Defendants' motions will be found moot.

## II.   FACTUAL BACKGROUND

In this section, the court briefly summarizes the factual background relevant to this decision. This includes an overview of the way SPS provides services to members of the proposed class; a description of SBBS, as that term is used both to describe Defendants' alleged shortcomings and Plaintiffs' proposed remedy; and brief portraits of the individual members of the proposed class who have been identified by the parties. The court does not recite the concerning, and contested, allegations Plaintiffs make regarding the operation of the SPDS because such facts are relevant only to establish that students attending the SPDS do not have access to educational services equal to their counterparts who attend neighborhood schools, an issue that is not relevant to Plaintiffs' Motion for Class Certification.

A.     Overview of SPS Services for Students with Mental Health Disabilities

During the 2015-16 school year, SPS enrolled 25,479 students who attended academic programs in sixty different buildings. (Dkt. No. 166, Supp. Mem. in Opp. to Class Cert. 3.) The majority of these students attend a neighborhood school. Approximately 5,000, or 20% of all SPS students, were students with disabilities. (Dkt. No. 97, Mem. in Support of Mot. for Class Cert. 2.) Dkt. No. 166 at 3.) In 2014, between 600 and 700 students were classified by SPS as having a mental health disability that interferes with their education. (Dkt. No. 97 at 2.) Approximately one-third of these students, or about 1% of SPS students, were enrolled at the three separate schools which comprise the SPDS. (*Id.*) As of May 1, 2016, 86 students were enrolled at the elementary school, 61 at the middle school, and 99 at the high school. (Dkt. No. 166-5, Aff. of Rhonda Jacobs 1.) Only students diagnosed with a mental health disability attend the SPDS. Each student placed at the SPDS receives services pursuant to an Individual Education Program ("IEP").

The majority of SPS students with mental health disabilities are not enrolled at the SPDS. (Dkt. No. 166 at 5.) Some portion of these students attend neighborhood schools and are enrolled in a Social Behavioral Support ("SEBS") program. The SEBS program provides an increased level of academic support to students who "exhibit significant and pervasive emotional and behavioral disabilities which affect overall psychological and academic functioning over a long period of time." (Dkt. No. 166 at 4.) For elementary and middle school students, the SEBS program is delivered using separate, "pull-out" classrooms. (*Id.*) High school students are provided with "behavioral and therapeutic supports throughout the day." (*Id.*) The SEBS program is offered in most, but not all, neighborhood schools. (*Id.*)

SPS has also adopted a Positive Behavioral Interventions and Supports ("PBIS") program, though the program has not yet been implemented at all schools. The PBIS program is intended to provide "proactive systems for improving student academic and behavioral outcomes for all

students." (*Id.*)The PBIS program is not one particular intervention, but rather is a "framework that guides selection, integration, and implementation of the best evidence-based academic and behavioral practices for improving important academic and behavior outcomes for all students." (*Id.*)

Plaintiffs allege SPS has not adequately implemented the programs they do offer. Plaintiffs have submitted email correspondence between various SPS employees who provide or coordinate special education evaluations and services to students. Among the issues documented in these emails are instances in which staff at a particular school failed to act in a manner consistent with SPS policies (Dkt. 159-3, 159-5, 159-6); staff at a particular school sought to have difficult students placed at the SPDS without properly documenting the need for such a placement (Dkt. 159-4, Dkt. 159-15); incomplete records may have prevented a student from receiving services (Dkt. 159-7); and students received inadequate behavior intervention plans ("BIPs") or their BIPs were inadequately implemented (159-14, 159-16). Many, if not all, of the issues raised by the emails arose in the context of activities related to SPS's compliance with its obligations under the IDEA. Plaintiffs assert the lapses documented in these emails also support their position that policies or practices existed within SPS which violated the ADA.

B.    SBBS

In addition to alleging SPS has not adequately implemented the programs they offer, Plaintiffs assert those programs are inadequate to provide equal access to educational services to students with mental health disabilities. As defined by Plaintiffs, SBBS does not consist of a particular intervention or protocol. Instead, Plaintiffs define SBBS as a combination of four separate services: "(a) comprehensive assessment, including determination of the purpose and triggers for the child's behavior; (b) a school-based intervention plan that relies on positive support, social skills

building, a care coordinator, and adjustments as needed to the curriculum or schedule; (c) training for school staff and parents in implementing the plan; and (d) coordination with non-school providers involved with the child." Plaintiffs assert, and their proffered expert, Peter Leone, Ph.D., has opined, that all members of the proposed class could be educated in neighborhood schools if Defendants provide SBBS. Dr. Leone has also opined that members of the proposed class require SBBS and that there exists "a professional consensus" that students like those in the proposed class require SBBS in order to be educated in neighborhood schools and to have equal access to educational services. Though Plaintiffs and Dr. Leone discuss SBBS as though the term refers to a single program that has been formally studied and found effective for students like those in the proposed class, Plaintiffs conceded, at the hearing, that the term SBBS was created for this litigation. Though invited to do so by the court, Plaintiffs have not provided the court with any peer-reviewed studies establishing the effectiveness of programs similar to SBBS.

C.     Members of the Proposed Class

Plaintiffs seek certification of a class comprised of all students who have been diagnosed with mental health disabilities and enrolled at the SPDS, rather than a neighborhood school. They have named one plaintiff, S.S. who is a member of this class. In addition, they have submitted declarations from the parents of D.S., J.R., J.C., and L.P., each of whom is a member of the proposed class. Dr. Leone provided brief descriptions of four other members of the proposed class: A.Mu., K.L., K.H., and W.C. Defendants have supplemented the information about some of these proposed class members and have provided declarations from the parents of L.C., J.M., and Z.A., three other members of the proposed class. The court briefly summarizes the information it has received regarding each of these students.

S.S.

S.S., the one named plaintiff who is part of the proposed class, has mental health disabilities including depression, attention deficit hyperactivity disorder, attention deficit disorder, and a mood disorder. He attended various neighborhood elementary schools from first grade through fourth grade. He was initially evaluated by SPS in second grade, but was not found to be eligible for special education services at that time. During fourth grade, S.S. experienced emotional and behavioral problems at school. SPS performed a psychoeducational evaluation, and S.S. also received a private psychological evaluation. SPS found S.S. eligible for special education services at that time and proposed an IEP for him. His mother accepted the IEP and S.S. began attending the SPDS elementary school at the beginning of his fifth grade year. S.S. continued to have difficulties while attending the SPDS and eventually SPS proposed S.S. be placed in an even more restrictive program within the SPDS. After consenting to the placement, S.S.'s mother filed an appeal using the administrative process provided for by the IDEA. As part of her appeal, she raised class claims similar to those raised here; however those claims were later dismissed by agreement of the parties.

While the administrative process was pending, SPS placed S.S. at the SEBS program at Chestnut Accelerated Middle School ("Chestnut"), a neighborhood school, for an extended evaluation. At the end of the extended evaluation period SPS returned S.S. to the SPDS. The administrative process initiated by S.S.'s mother concluded with a finding that S.S.'s placement at the SPDS satisfied the requirements of the IDEA and a less restrictive placement in the SEBS program at Chestnut would not have done so. S.S. has not appealed that finding, but has exhausted the administrative process available under the IDEA.

D.S.

D.S. is a member of the proposed class. He attended a neighborhood elementary school prior to being enrolled at the SPDS. (Dkt. No. 159-8, Declaration of D.S., father of D.S.) While a

student at the neighborhood school, D.S. was disciplined for certain behaviors. (*Id.*) His father does not remember the staff at the neighborhood school making any effort to determine whether the behavior was the result of D.S.'s disability; however, Defendants assert D.S. was in a SEBS program, received a Functional Behavioral Assessment ("FBA"), and had a BIP while attending his neighborhood school. When D.S. was in fourth grade, his mental health disability resulted in a one-week hospitalization. (*Id.*) Following the hospitalization, D.S. was placed at the SPDS. (*Id.*) The placement was later made permanent. D.S.'s father was not aware of any efforts made to coordinate care between the school and outside providers or to determine whether D.S. could return to his neighborhood school with proper supports. (*Id.*). Despite providing SPS with documentation from D.S.'s therapist recommending he be moved out of the SPDS, D.S. remains at the SPDS. He is currently placed in the Transitions program at the SPDS high school pursuant to an Agreement Reached Through Mediation signed by D.S.'s father.

Plaintiffs do not contend D.S. has exhausted the administrative process available under the IDEA.

J.R.

J.R. is a member of the proposed class. He has a mental health disability and began attending school at the SPDS during the 2015-16 school year. Prior to being transferred to the SPDS, J.R. attended school at the Chestnut Accelerated Middle School ("Chestnut"), a neighborhood school. While attending Chestnut, J.R. was frequently suspended from school for behavioral problems related to his mental health disability. J.R.'s father, P.R., received phone calls, but was not provided any documentation related to the suspensions.

On one occasion, staff at Chestnut called a crisis services team to provide J.R. with emergency care, but did not communicate directly with J.R.'s father. J.R. was placed in a partial hospitalization and when he was discharged from the partial hospitalization program, SPS

unilaterally placed him at the SPDS. J.R. dislikes SPDS and wishes to return to a neighborhood school.

Defendants state J.R. received an IEP, FBA, BIP, and Speech Language Evaluation when he was in second grade at his neighborhood school. Additionally, they assert he was first placed at the SPDS in 2012 for a six-week evaluation with the consent of his parents. Following the evaluation period and the examination of data collected during that time, J.R.'s IEP team recommended he return to the SEBS program at his neighborhood school. He attended that program during fourth and fifth grade before being placed at the SPDS pursuant to his IEP.

Plaintiffs do not contend J.R. has exhausted the administrative process available under the IDEA.

<u>J.C.</u>

J.C. is a 19-year-old resident of Springfield and member of the proposed class. He previously attended the SPDS, but dropped out without receiving a high school diploma. Prior to attending the SPDS he was enrolled in the SEBS program at the High School of Science and Technology ("Sci. Tech."), a neighborhood school. While in the SEBS program, J.C. had behavioral problems. In response, SPS transferred him to the SPDS. Although his mother wanted him transferred to another neighborhood school or a vocational program, she consented to the transfer because she did not believe she had any other choice. Defendants assert the transfer was made at the recommendation of the IEP team, following the evaluation of data collected by a behavioral specialist and a neuropsychologist. After attending the SPDS for a period of time, J.C. asked to go back to Sci. Tech. or another neighborhood high school. His request was denied and soon after he stopped attending school.

Plaintiffs do not contend J.C. has exhausted the administrative process available under the IDEA.

L.P.

L.P. was an eighth grader at the SPDS during the 2015-16 school year, has a mental health disability, and is a member of the proposed class. Prior to attending the SPDS, L.P. attended elementary school at three different neighborhood schools. When he was in fifth grade, L.P. had an FBA and a BIP. L.P. attended middle school at Chestnut. While at Chestnut, L.P. enjoyed reading and math classes, but struggled to understand his school work because of his disability. L.P. is well-behaved outside of school, but he began having behavioral problems at school. The staff at Chestnut responded to L.P.'s behavioral problems by threatening him with court or probation. L.P. was physically restrained and, on one occasion, was hit by staff at Chestnut. After that incident, L.P.'s mother, M.P., applied for a criminal complaint. The application was denied by the clerk magistrate after the Chestnut principal explained that the incident happened while L.P. was having a mental health crisis.

After M.P. filed her application for a criminal complaint, she received notice that staff at Chestnut had initiated delinquency proceedings against L.P.; M.P. believes that action was initiated in retaliation. Around the same time, SPS reassigned L.P. to the SPDS. Since M.P. was concerned about the way L.P. had been treated at Chestnut, she consented to the transfer. M.P. has tried to have L.P. moved back to a neighborhood school, but has been unsuccessful. It is her understanding that SPS would have placed L.P. back at a neighborhood school if she was willing to waive any claims for special education services for him.

Plaintiffs do not contend L.P. has exhausted the administrative process available under the IDEA.

A.Mu.

A.Mu. is fourteen years old, was enrolled at the SPDS from 2013 through June of 2015, and is a member of the proposed class. Plaintiffs' offered expert, Dr. Leone, reviewed A.Mu.'s school

records and found comments indicating that multiple SPS employees viewed his difficulties as stemming from lack of effort or motivation, rather than his disability.

Plaintiffs do not contend A.Mu. has exhausted the administrative process available under the IDEA.

K.L.

K.L. is a member of the proposed class. Prior to attending the SPDS, she was enrolled in the SEBS program at Commerce High School. During an altercation with another student, K.L. hit a police officer in the thigh while the officer attempted to place her in handcuffs. K.L. was charged with disturbing a school, assault and battery on a police officer, and resisting arrest. Plaintiff's offered expert, Dr. Leone, reviewed her records and opined that a school using SBBS would have had other tools available to help K.L. and would not have called the police or attempted to criminalize behavior that was connected to a student's mental health disability.

Plaintiffs do not contend K.L. has exhausted the administrative process available under the IDEA.

K.H.

K.H. was enrolled in the SEBS program at Van Sickle Middle School during the 2010-11 academic year and is a member of the proposed class. An IEP developed for him in January of 2011 stated that he could complete grade level curriculum with help from support staff and that he was consistently able to participate in some integrated classes. Plaintiffs' expert, Dr. Leone, opines that K.H. could have remained at a neighborhood school had he been provided with SBBS. Dr. Leone does not, however, describe particular areas of difficulty for K.H. or indicate how implementation of SBBS would have addressed his needs.

Plaintiffs do not contend K.H. has exhausted the administrative process available under the IDEA.

W.C.

W.C. is a member of the proposed class. In elementary school he was placed in a SEBS program. His records indicate he had academic and behavioral difficulties in that program. Those difficulties continued as he attended middle school at Chestnut. However, Plaintiffs' proposed expert, Dr. Leone, has reviewed his school records and concluded that W.C. received no meaningful assessment or evaluation of his behavioral challenges until he was in eighth grade. When a psychological evaluation was conducted, the recommended services included a "behavior management plan." The first BIP in W.C.'s school records was dated March 1, 2011. Just days later, before there was sufficient time to meaningfully implement the BIP, W.C. was transferred from Chestnut to the SPDS.

Plaintiffs do not contend W.C. has exhausted the administrative process available under the IDEA.

L.C.

L.C. is a member of the proposed class. He suffers from Post-traumatic Stress Disorder and Attention Deficit Hyperactivity Disorder ("ADHD"). Currently, L.C. is enrolled in the 8th grade at the SPDS. In 2008 he attended kindergarten for a second time at his neighborhood elementary school, Brightwood Elementary in a Partial Inclusion Program. He had difficulty with large groups and was behind academically. The following year he attended his neighborhood school, Mary O. Pottenger Elementary School, and was again placed in a SEBS program. He had a difficult time adjusting and was suspended for hitting, biting, and kicking staff and other students. L.C. often isolated himself from the rest of his class. From 2010 to 2014, L.C. attended the SEBS program at Gerena Elementary School, which was his neighborhood school.[1] During these years, L.C.

---

[1] The record is silent as to reason L.C. had three different neighborhood schools while in elementary school, but the court observes that students in transient living situations are likely to experience transitions among neighborhood schools.

continued to be aggressive towards staff and other students. He continued to self-isolate and his academics suffered. At an IEP Team meeting at the end of the 2013-14 school year, L.C.'s SPS Case Manager proposed to L.C.'s parents that he attend the SPDS middle school.

Plaintiffs do not contend L.C. has exhausted the administrative process available under the IDEA.

J.M.

J.M is a member of the proposed class and is currently a student at the SPDS middle school. He is diagnosed with ADHD and Asperger's syndrome. In 2013, while attending a Partial Inclusion Program at his neighborhood elementary school, Glickman Elementary School, J.M experienced difficulties with changes to routines, working with classmates, and high noise levels. He was often disruptive. In November of 2013, J.M. was hospitalized. When he returned from the hospital, J.M.'s SPS Case Manager proposed to his mother that he be placed at the SPDS elementary school. She agreed with the recommendation.

Plaintiffs do not contend J.M. has exhausted the administrative process available under the IDEA.

Z.A.

Z.A. is a member of the proposed class. He suffers from seizures, Post-traumatic Stress Disorder, Anxiety, Depressive Disorder, Mood Disorder and Oppositional Defiant Disorder. In the spring of 2012 he attended his neighborhood elementary school in a Partial Inclusion Program. The following fall he transitioned to a SEBS program at Marcus Kiley Middle School, his neighborhood middle school. While in the SEBS program, Z.A. had a number of difficulties. He had difficulty completing assignments and transitioning between tasks. Z.A. was argumentative with authority figures and referred to other students using inappropriate language and racial slurs. When he was

upset he would become destructive: climbing on furniture, throwing furniture, and punching walls. At some point in 2012, Z.A. was hospitalized.

At a 2013 IEP meeting, Z.A.'s mother insisted Z.A. be placed at the SPDS; the IEP Team had proposed that Z.A. remain at the neighborhood middle school. Z.A. attended the SPDS from 2013 until 2015. During that time, his use of inappropriate language decreased, he increased the percentage of assignments he completed, and his destructive behaviors diminished significantly. In January of 2016, Z.A. transitioned back to the SEBS program at his neighborhood middle school, which at that time was Van Sickle Academy.

Plaintiffs do not contend Z.A. has exhausted the administrative process available under the IDEA.

### III.   DISCUSSION

A.   Statutory Background

As the court described in more detail in its Memorandum and Order denying Defendants' Motion to Dismiss (Dkt. No. 102), both the ADA and the IDEA impose obligations on public school districts relating to the provision of services to disabled students. Title II of the ADA is a broadly applicable civil rights statute which bars public entities from discriminating against a "qualified individual with a disability" or excluding them from participation in or denying them "the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Pursuant to Title II, when a public entity provides an "aid, benefit, or service," it cannot, on account of disability, give disabled individuals an "opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 28 C.F.R. § 35.130(b)(1)(ii). A public entity is required to "make reasonable modifications in policies, practices, or procedures" when necessary to avoid discrimination on the basis of disability unless it "can demonstrate that making the

14

modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7); *see also* 42 U.S.C. § 12182(b)(2)(A)(ii). The ADA does not specify how public entities must meet their general obligation to provide equal access.

The IDEA, on the other hand, imposes a detailed set of substantive and procedural obligations on school districts receiving federal funds in order to ensure school districts provide appropriate educational services to students with disabilities. Under the IDEA, the adequacy of a placement is not measured against what is provided to other students. *See, e.g. C.G. ex rel. A.S. v. Five Town Comm. Sch. Dist.*, 513 F.3d 279, 284 (1st Cir. 2008); *Bd of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 181-82 (1982). Instead, school districts are required to follow specific procedures to create, and implement, an "individualized educational program" ("IEP") for each disabled student. Substantively, each IEP must provide the disabled student with "[a] free appropriate public education," ("FAPE"). *Burlington v. Dept. of Educ.*, 736 F.2d 773, 788-89 (1st Cir. 1984). The FAPE requirement "establishes a basic floor of education." *Id.* School districts are required to "provide an adequate and appropriate education," but are not "under a compulsion to afford a disabled child an ideal or an optimal education." *C.G.*, 513 F.3d at 284.

The regulations implementing the IDEA further require that a FAPE be provided in "the least restrictive environment" ("LRE"), meaning that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are nondisabled." 20 U.S.C. § 1412(a)(5)(A). The LRE requirement encourages placements that give disabled students access to the same educational experiences available to nondisabled students, as long as such a placement provides a FAPE, even if a disabled student might better maximize his or her educational potential in a more restricted environment. *See Roland M. v. Concord Sch. Comm.,* 910 F.2d 983, 993 (1st Cir. 1990). Under the IDEA, an appropriate educational plan must balance "the marginal benefits to be gained or lost on both sides of the maximum benefit/least restrictive fulcrum." *Id.* As with all

15

aspects of the development of IEPs under the IDEA, such a balancing must be based on the specific needs of the individual child.

A set of procedures are available to help parents and school districts resolve disputes related to matters governed by the IDEA. Any party is entitled to make a formal complaint about "any matter relating to the identification, evaluation, or educational placement of [a] child, or the provision of a free appropriate education to such child." 20 U.S.C. § 1415(b)(6). A complaining party "has recourse to an impartial due process hearing," either conducted by a state educational agency or conducted at the local level with an opportunity to appeal to a state educational agency. *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 58 (1st Cir. 2002). Following a due process hearing, a dissatisfied party can bring suit in state or federal court. *Id.* at 59.

The IDEA requires that a party exhaust their administrative remedies before filing suit in order to ensure the educational agency has the opportunity "to develop a factual record, to apply its expertise to the problem, to exercise its discretion, and to correct its own mistakes," prior to litigation. *Christopher W. v. Portsmouth Sch. Comm.*, 877 F.2d 1089, 1094 (1st Cir. 1989). Exhaustion is not only required before a party can litigate issues arising under the IDEA; a litigating party must also exhaust before bringing suit "pursuant to a different statute so long as the party is seeking relief that is available under subchapter II of IDEA." *Rose v. Yeaw*, 214 F.3d 206, 210 (1st Cir. 2000). Absent an exception, these procedures must be exhausted before a party can litigate a claim under the IDEA. *Id.*

Exhaustion is not required if it would be futile or inadequate. *Honig v. Doe*, 484 U.S. 305, 327 (1988) (interpreting the requirement under the predecessor statute). At the same time, "[a]llowing plaintiffs to bypass the IDEA's administrative process en route to state or federal court disrupts [the IDEA's] carefully calibrated balance and shifts the burden of factfinding from the educational specialists to the judiciary" in a manner that "is directly at odds with the method of the IDEA."

*Frazier*, 276 F.3d at 61. The First Circuit has balanced these competing interests by requiring exhaustion of administrative remedies where the advantages of exhaustion apply, "even though the administrative process does not offer the specific form of relief sought by the plaintiff." *Id.* A party seeking an exception to the exhaustion requirement bears the burden to demonstrate that such an exception applies. *Id.* at 59.


B.    Exhaustion

As this case involves a dispute regarding the provision of special education services, the court must first determine how the IDEA administrative exhaustion requirement applies. While S.S. exhausted his administrative remedies prior to this litigation, Plaintiffs have not limited the proposed class to include only those who have exhausted their IDEA procedural remedies. Plaintiffs also have not argued that there is an exception to the exhaustion requirement applicable simply because Plaintiffs have framed this litigation as a class action, and the court has found no such exception. *See, e.g., Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 494 n.3 (7th Cir. 2012) (considering whether futility exception could be applied "to excuse the plaintiffs' failure to exhaust administrative remedies prior to bringing a class-action suit"); *Hoeft v. Tucson Uni. Sch. Dist.*, 967 F.2d 1298, 1304 (9th Cir. 1992) (declining to recognize a separate exhaustion exception for cases involving challenges to policies applied to all members of a proposed class). The court therefore considers whether exhaustion is required and, if so, whether an established exception applies.

When a plaintiff brings a suit under a statute other than the IDEA, exhaustion is still required if the relief sought is also available under the IDEA; however, consideration of the futility exception "overlaps with the 'relief available' language of § 1415(*l*) in the sense that relief is not available within the meaning of § 1415(*l*) if the due process hearing provided by subchapter II of IDEA does not provide relief that addresses the claim of the complainant." *Weber v. Cranston Sch.*

*Comm.*, 212 F.3d 41, 52 (1st Cir. 2000).  Thus, a plaintiff is not required to "participate in an IDEA due process hearing," before bringing a claim under the ADA, "if the relief available through such a hearing would not address the claim of the party." *Id.* However, even if an IDEA due process hearing cannot provide the exact relief sought by the party, exhaustion may be required if the underlying purposes of the exhaustion requirement will be served. *Frazier*, 276 F.3d at 61.

For example, in *Frazier*, the First Circuit ruled that a plaintiff was required to exhaust remedies available under the IDEA before filing a suit seeking money damages under 42 U.S.C. § 1983, based on violations of the IDEA, even though the specific remedy sought, money damages, is not available through the IDEA administrative process. The First Circuit reviewed the rationale behind the exhaustion requirement and determined the benefits provided by the requirement, most importantly the creation of an evidentiary record by educational professionals with specialized knowledge, would accrue where the underlying claims concerned topics relevant to the IDEA, such as "the evaluation and education of those with special needs." *Id.*

While Plaintiffs do not need to demonstrate a violation of the IDEA in order to prevail on their ADA claim, their claim does concern the delivery of services to students whose educational programs are governed by IEPs. To the extent there are flaws in the IEPs or the implementation of IEPs of members of the proposed class, requiring administrative exhaustion ensures "that educational agencies will have an opportunity to correct shortcomings in a disabled student's . . . IEP," before the dispute reaches litigation and consistent with the regulatory scheme established under the IDEA. *Id.* For example, the mother of L.P. asserts that SPS was willing to return L.P. to a neighborhood school if she waived claims to special education services; if this is accurate, it is possible that L.P. is placed at the SPDS in violation of the IDEA and administrative exhaustion could provide L.P. a remedy that would remove him from the proposed class. Similarly, if W.C. was, in fact, placed at the SPDS just days after his first BIP was drafted, exhausting his IDEA remedies

could result in a placement at a neighborhood school where the BIP can be properly implemented.

Since the members of the proposed class may achieve a remedy through an IDEA administrative

hearing related to the claims raised here, the court finds the IDEA exhaustion requirement applies to

individual members of the proposed class.

The exhaustion requirement provides one basis for denying Plaintiffs' Motion for Class

Certification. Some of the same concerns that lead the court to that decision also demonstrate that

Plaintiffs have not met their burden to establish the elements required for class certification.


C.      Class Certification Standard

"The class action is 'an exception to the usual rule that litigation is conducted by and on

behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013)

(quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). This exception is justified only when

there is a class representative who is part of the class and shares the same interest and injury as other

class members. *Id.* Rule 23 sets out the requirements for class certification. A party seeking

certification of a class bears the burden of demonstrating the proposed class meets all four of the

requirements under Rule 23(a) and one of the additional requirements under Rule 23(b).[2] *Wal-Mart

Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011). The four requirements of Rule 23(a) are (1)

numerosity, meaning the class is so numerous that joinder of all members is impracticable; (2)

commonality, meaning there are questions of law or fact that are common to the class; (3) typicality,

meaning there are claims or defenses available to the representative parties that are typical of those

available to the other class members; and (4) adequacy, meaning the representative parties have

interests sufficiently aligned with the interests of class members, and that the representatives are able

---

[2] In addition, counsel for the class must also demonstrate they are qualified and capable of representing the class. Fed. R. Civ. P. 23(g). This last element has not been contested by Defendants and the court, seeing no basis for any contest, finds counsel for the proposed class qualified and capable.

to fairly and adequately protect the interests of the class. Of the several requirements under Rule 23(b), Plaintiffs assert their claim satisfies 23(b)(2), which requires that the opposing party "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). When a plaintiff cannot meet their burden as to any of these elements, class certification is not warranted.

The First Circuit describes the first element, numerosity, as presenting a "low threshold," generally met where the proposed class includes at least forty members. *García-Rubiera v. Calderón*, 570 F.3d 443, 460 (1st Cir. 2009) (citing *Steward v. Abraham*, 275 F.3d 220, 226-27 (3d Cir. 2001)). Absent the exhaustion requirement, Plaintiffs proposed class easily meets the numerosity requirement. More than two hundred students are currently enrolled at the SPDS and there are other students who have dropped out rather than attend the SPDS. In the absence of this court's ruling regarding exhaustion, Plaintiffs would certainly have established numerosity.

Historically, the second element, commonality, has also been treated as setting a "low bar." *In re New Motor Vehicles Canadian Export Antitrust Litigation*, 522 F.3d 6, 19 (1st Cir. 2008). More recently, the Supreme Court has clarified that though Rule 23(a) frames the second element as requiring only a demonstration that "there are questions of law or fact common to the class," commonality requires "the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 349-50. Following *Wal-Mart*, it is not sufficient for a plaintiff to allege merely that all class members have suffered a violation of the same law; plaintiffs' "claims must depend upon a common contention" and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution." *Id.* at 350. A contention is capable of classwide resolution if the "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Here, Plaintiffs assert "that Springfield's systemic denial of SBBS 'harms all students in the class,'" the failure to offer SBBS either violated the ADA as to all students or no students, and, therefore, an order requiring SPS to provide SBBS at all neighborhood schools would resolve the case for all class members. (Dkt. No. 157 Pls.' Supp. Mem. in Supp. of Mot. for Class Cert., quoting Dkt. 158-1, Leone Statement,  at ¶ 54.) The court does not find this framing persuasive. Plaintiffs have placed SBBS at the center of their claim, alleging a failure to provide it caused a common harm to all members of the proposed class and that an order requiring Defendants to provide it would provide a classwide remedy. Implicit in the framing is the presumption that SBBS is a term that refers to a well-defined program that can be implemented in a manner that will benefit all members of the proposed class regardless of the specific histories, diagnoses, and behaviors of individual class members. Yet, at the hearing, Plaintiffs conceded that SBBS is only a term they put forth for this litigation to refer to a specific set of obvious, best-practice-related services. Plaintiffs were unable to direct the court to any academic studies that include the concept of an actual SBBS program as they framed it.

Plaintiffs' admission that SBBS is not an identifiable program or even a term used within the wider special education field directly undercuts Dr. Leone's assertions that there exists "a professional consensus" that students like the proposed class members "require SBBS" in order to access educational services equal to those available to students without disabilities and could only be successfully educated in neighborhood schools if SBBS were provided. (Dkt. No. 158-1, Leone Statement ¶ 41.) It also raises the question of how Defendants could have had a policy or practice with respect to the provision of SBBS, prior to the initiation of this suit, which could form the basis of an ADA violation.

Looking past the packaging, the court finds insufficient evidence to establish all SPDS placements of members of the proposed class could have been prevented by the provision of the

services comprising SBBS. The court further finds insufficient evidence these SBBS phrased services could provide a single remedy applicable to the whole class. The four services comprising SBBS are described by Plaintiffs in extraordinarily broad terms, consistent with common sense but offering no insight into practical application. Each service would need to be implemented using the same type of individualized process already required under the IDEA. Even if these services could, in theory, provide a universally positive outcome, the diversity of circumstances affecting members of the proposed class will create a myriad of unique challenges that will have to be overcome on a student by student basis in order to implement each of these entwined services. For example, determining behavioral triggers may prove to be a very difficult undertaking for some members of proposed class and implementing parental training will be difficult, if not impossible, for some members of the proposed class. Additionally, while the ADA obligates school districts to make accommodations necessary to provide equal access to educational services to all students regardless of disability, that obligation must be harmonized with the far more specific obligations imposed by the IDEA. *U.S. v. Lahey Clinic Hospital, Inc.*, 399 F.3d 1, 10 (1st Cir. 2005) (stating federal statutes are to be read harmoniously, unless Congress has clearly and unambiguously expressed a contrary intent). Each member of the class was placed following the creation of an IEP and any alternative placement would have to satisfy both the equal access obligation under the ADA and the individualized obligations under the IDEA, a determination that must be made separately for each student. In short, Plaintiffs have failed to demonstrate that all SPDS placements could have been prevented by the provision of or that SBBS could be applied to effect a classwide remedy.

Having concluded that Plaintiffs have not met their burden with respect to the commonality element for class certification, the court could end its analysis here. However, for reasons similar to those underlying the court's conclusion that IDEA exhaustion is required of all plaintiffs in this case, the court determines that Plaintiffs have also failed to establish the third and fourth requirements of

Rule 23(a): typicality and adequacy. Prior to bringing this suit, Plaintiff first exhausted his IDEA remedies. This process included a finding that SPS had met its obligations to provide S.S. with a FAPE in the LRE. Plaintiffs have not challenged that determination and so it is the law of this case with respect to S.S., distinguishing the claims available to S.S. from those that may be available to other members of the proposed class. Similarly, the fact S.S. has exhausted his IDEA remedies sets his claims apart from those of other members of the proposed class who have not exhausted, and prevents Plaintiffs from demonstrating that S.S. can fairly and adequately represent the class. *See Miller v. Board of Ed. Of Albuquerque Pub. Sch.*, 455 F. Supp. 2d 1286, 1294 (D. N.M. 2006).

## IV.   CONCLUSION

For the reasons discussed above, the court denies Plaintiffs' Motion for Class Certification. For purposes of reaching this ruling the court has considered the opinions of Plaintiffs' proffered expert, without first deciding whether such consideration is warranted. As Defendants' have achieved their desired outcome as to the Motion for Class Certification, the court finds moot their Motion to Exclude or Limit and their Motion for an Evidentiary Hearing.

It is So Ordered.

_/s/ Mark G. Mastroianni_____
MARK G. MASTROIANNI
United States District Judge